CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

MAY 12 2021

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.

CHRISTINE FAVARA ANDERSON

Case No. 3:21CR00005

In Violation of: 18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1001
18 U.S.C. § 1519

**INDICTMENT**

The Grand Jury charges that:

**Background**

**A. The Defendant and Her Fraud Schemes**

1. At all times pertinent to this Indictment, Christine Favara Anderson ("ANDERSON") was a resident of Madison County, Virginia, in the Western District of Virginia.

2. As described in greater detail below, ANDERSON took money from book authors by promising to be their book publisher. ANDERSON later failed to pay the authors their royalties as owed and did not provide products and services they negotiated. ANDERSON often used a false cancer diagnosis to delay payment to the book authors, while also purporting to maintain wealth. ANDERSON used the mail and email accounts to communicate with the authors.

3. As described in greater detail below, ANDERSON also purported to be interested in purchasing expensive real estate and, in doing so, misrepresented her wealth through fraudulent proof of funds notes. During these transactions, R.B. and R.G. helped ANDERSON in purchasing the real estate, believing themselves that she had the means to purchase the real estate. ANDERSON also convinced R.B. and R.G. to "loan" her money, knowing that she could not and would not repay them. ANDERSON used her promise of providing more money to R.B. and R.G. as well as her fraudulent cancer diagnosis to garner sympathy and take money from R.B. and R.G.,

while also causing losses to real estate owners who thought she was actually interested in and could purchase their properties, which she could not. ANDERSON used and caused to be used the mail and email accounts to communicate with the parties associated with the real estates, as well as with R.G. and R.B. For example, in or about March 2020, ANDERSON mailed several bad checks to R.B. as "repayment" for the loans.

    4.  During both the book publishing and the real estate schemes, ANDERSON used R.G. to fund her fraudulent activities and act on her behalf. R.G. is a resident of Texas and an author and attorney. ANDERSON became acquainted with R.G. after publishing one of R.G.'s books. During the fraudulent schemes, R.G. purported to be either ANDERSON's attorney, advisor, agent, or representative of ANDERSON. R.G. often communicated ANDERSON's false statements and other misrepresentations on ANDERSON's behalf, believing herself that ANDERSON had wealth and cancer. R.G. used email to communicate with people on ANDERSON's behalf. R.G. has "loaned" ANDERSON close to $1 million, all while believing ANDERSON has Stage 4 cancer and wealth and that ANDERSON will repay R.G. the loan plus far more in interest. ANDERSON used "proof of funds" notes in order to convince R.G. of her wealth. ANDERSON conveyed to R.G. that she does not have access to her wealth due to a variety of false reasons, including that an accountant embezzled money from ANDERSON and that the SEC and FBI have frozen her accounts, none of which are true.

  **B.** **The Defendant Owes Restitution**

    5.  In or about April 2005, ANDERSON was indicted in the Northern District of Illinois for securities fraud. *See United States v. Favara*, No. 1:05-CR-340 (N.D.Ill). In or about June 2009, after a plea of guilty, the district court ordered her to pay $155,000 in restitution.

6. In or about July 2005, the Securities and Exchange Commission ("SEC") filed a Complaint for violations of federal securities laws against ANDERSON. *See SEC v. Favara*, No. 2:05-CV-05486 (C.D. Cal). In or about March 2006, ANDERSON entered into a consent judgment. The district court ordered that ANDERSON pay a civil penalty of $100,000 and pay back $15,000 in ill-gotten gains.

**C. Book Publishing Scheme**

7. Starting in or about 2012, ANDERSON moved to the Western District of Virginia and began owing money to the U.S. Government based on the prior judgments.

8. Between approximately 2014 and 2017, ANDERSON owned and operated a publishing company known as Christine F. Anderson Publishing & Media ("CFA"). ANDERSON later renamed CFA to Sage Wisdom Publishing ("Sage Wisdom") and operated under that entity name from approximately 2017 through 2020. During this time, ANDERSON used both entities to perpetuate a scheme on book authors wherein the authors were defrauded of royalties from sales of their published works as well as certain products and services relating to the publishing of their books.

9. For example, on or about January 27, 2016, author J.T. entered into a publishing contract with ANDERSON for one of her books. J.T. agreed to pay ANDERSON a retainer of $1,000 for "marketing and publicity," and in return, ANDERSON agreed to pay J.T. a percentage of royalties. On August 20, 2016, J.T. entered into a publishing contract with ANDERSON for another book. According to the contract, J.T. paid ANDERSON an upfront, refundable retainer of $3,900 for translation, promotion, and marketing. In return, ANDERSON agreed to pay J.T. a percentage of royalties and to continue to market and publish J.T.'s book.

10. During the course of the book publishing scheme involving J.T., ANDERSON and J.T. would communicate via email. ANDERSON would make false statements regarding her health to engender sympathy and excuse delay in contractual obligations to J.T. On or about September 22, 2016, ANDERSON stated that she had "emergency surgery" and was diagnosed with Stage 2 colon cancer, with "8 weeks of chemo and radiation ahead of [her]." On or about November 1, 2016, ANDERSON wrote to J.T. that she was having a "health crisis" and that ANDERSON "just got in from an assessment today and was told the cancer has spread to the lining of [her] stomach."

11. In or about 2017, to in or about 2020, J.T. made many attempts to obtain royalties and copies of audiobooks owed to her by ANDERSON. J.T. would communicate with R.G. and ANDERSON through email in order to obtain these royalties. ANDERSON caused R.G. to communicate to J.T. a number of reasons for the failure to provide J.T. what was owed, including that:

   a. funds were not yet available because the Patriot Act has a ten-day hold on seven-figure wires;

   b. checks needed to provide funds were coming by private plane, but there was a "wheel issue" and also that the plane was fogged in at the airport;

   c. there was "some sort of transformer problem" that delayed the transfer of funds; and

   d. religious holidays "created a wire backlog."

12. To date, there are no foreign translations of J.T.'s books. J.T. has not received the royalty payments she is owed nor the audiobooks.

13. On or about April 20, 2017, author S.W. entered into a contract with ANDERSON's company to publish her books. Throughout the publishing relationship, S.W. communicated with ANDERSON using email. S.W.'s books began selling on Amazon, but ANDERSON was not paying S.W. her royalties. S.W. communicated with R.G., who purported to act on behalf of ANDERSON, in order to obtain royalty payments.

14. For example, in or about December 2017, ANDERSON sent S.W. a check through the mail for over $3,000 in royalty payments, but the check did not clear with S.W.'s bank because ANDERSON did not have enough funds. According to emails between ANDERSON, S.W., and R.G., ANDERSON purported to have wealth but currently had issues with banks "closing" her accounts suddenly and without explanation.

15. According to emails by R.G., ANDERSON's excuse for not making the royalty payments was that ANDERSON was, in part, busy working with the White House on the State of the Union and that Morgan Freeman was spending time with his "friend," ANDERSON. ANDERSON led R.G. to believe she had wealth and power by falsely claiming relationships with famous people, like President Trump and celebrities. And then R.G. communicated these misrepresentations to authors, like S.W., in order to convey that ANDERSON would eventually pay the royalties, all while ANDERSON kept the royalties for herself and was taking money from R.G.

16. In emails between R.G. and S.W., R.G. states: "I gather that you think that I have been lying to you, or else I am deeply deluded [about ANDERSON]! But actually, I spent a good deal of time in the beginning testing and checking. That's what happens when you work with someone whose story is literally unbelievable...but all true." ANDERSON provided false

representations of her wealth and power to R.G., in order for R.G. to believe, or "test and check" ANDERSON's wealth, and R.G. believed her.

17. On or about December 18, 2017, ANDERSON emailed S.W. about ending their publishing relationship, thanked S.W. for "firing" her, and mentioned that she was fighting a medical condition since 2001. On or about December 19, 2017, S.W. rescinded her contract with ANDERSON. S.W. has not received any royalty payments for the book published through ANDERSON.

18. In or about 2017 to in or about 2020, numerous other authors entered into book publishing contracts with ANDERSON. These authors entered into similar contracts with ANDERSON that called for an upfront retainer, but rarely if ever received royalties owed to them, nor a refund of the fees paid.

**D. Real Estate Scheme**

19. On or about October 15, 2019, ANDERSON changed or caused to be changed the registered name of Sage Wisdom to the Roar Charitable Fund, LLC. On or about March 12, 2020, ANDERSON also created or caused to be registered a second entity, Roar Real Estate, LLC.

20. In or about December 2019, ANDERSON tried to purchase Aerie Farm in Orange County, Virginia, with a sales price of $1.8 million. During the course of this sales transaction, ANDERSON provided two "proof of funds" letters from a purported account with Goldman Sachs, in which she represented that she had $2,000,000 and $4,459,392 in certain bank accounts. No such accounts with that amount of money has ever existed. During the sales transaction for the farm, ANDERSON, using email, promised that wire transfers were forthcoming to complete the real estate transaction, none of which materialized. In emails, ANDERSON and R.G. claimed

ANDERSON was the victim of identity theft and fraud, which purported to excuse the lack of wire transfers, and that she had Stage 4 cancer. This real estate transaction was never finalized.

21. In or about March 2020, R.B., mentioned above, travelled to Virginia to visit ANDERSON. R.B. made the trip because ANDERSON told him that she had Stage 4 cancer and that ANDERSON wanted R.B.'s help with some real estate transactions. During R.B.'s visit to Virginia, ANDERSON made numerous statements regarding her purported wealth. ANDERSON told R.B. that she had two million shares of MGM stock that she received from a trust and over $60 million in total stocks. ANDERSON stated that she has only been able to access her funds two years ago because of the SEC and the "regulations" the SEC had on ANDERSON's accounts. ANDERSON also told R.B. that she was in escrow on three properties totaling nearly $8 million dollars.

22. During his trip in or about March 2020, ANDERSON asked R.B. if he wanted to make money by being her referring agent. R.B. referred ANDERSON to a property located in Paw Paw, West Virginia ("Crooked Run Farm"), with a sales price of $3.7 million. On or about April 24, 2020, ANDERSON caused a letter to be sent from her purported accountant to the seller of the Crooked Run Farm, stating that ANDERSON held a Goldman Sachs savings account solely in her name with a balance of $6.8 million. ANDERSON also sent this letter to R.B. ANDERSON also caused to be furnished as part of the transaction a document purporting to be from Goldman Sachs likewise "confirming" the account in good standing. No such account with Goldman Sachs has ever existed.

23. ANDERSON, operating through the Roar Real Estate LLC, made an offer to purchase the Crooked Run Farm. The seller of the Crooked Run Farm property accepted ANDERSON's offer of $3.7 million. An earnest money deposit ("EMD") in the amount of

$111,000 was due from ANDERSON on or about May 6, 2020. ANDERSON never paid the EMD, and the contract for the Crooked Run Farm was terminated.

24. On or about May 19, 2020, ANDERSON changed or caused to be changed the registered name of the Roar Real Estate LLC to The Roar Trust.

25. On or about July 17, 2020, ANDERSON, operating through The Roar Trust, made an offer to purchase a property in Culpeper, Virginia ("Walden Hall" property). The offer price for the Walden Hall property was $4.5 million. Closing was scheduled for July 30, 2020, and an EMD in the amount of $75,000 from ANDERSON was due on or about July 20, 2020. In connection with the transaction, ANDERSON caused to be sent a proof of funds purporting to confirm an investment account at Chase Bank with a balance of more than $8.4 million. No such bank account with that amount of money has ever existed.

26. On or about July 19, 2020, ANDERSON wrote a $75,000 check for the Walden Hall EMD. The check was returned due to a stop payment being placed on the check. On or about July 28, 2020, ANDERSON wrote a second EMD check, this time in the amount of $100,000 from a purported Bank of New York Melon Account affiliated with The Roar Trust. This check was also returned. For several weeks thereafter, ANDERSON communicated or caused others to communicate on her behalf, through email, various reasons for the delays in the transfers of funds, including among other things that:

    a. ANDERSON's health was not well;

    b. there were continued issues with her banks and the money transfer;

    c. ANDERSON received news of the accidental death of someone close to her;

    d. ANDERSON's prior accountant had committed fraud or embezzled from her accounts, and there was an ongoing "legal battle";

    e.  ANDERSON had upcoming stomach surgery and related appointments;

    f.  doctors had found metastases on ANDERSON's brain; and

    g.  the 9/11 anniversary caused her to be depressed and emotional.

27.    Ultimately, ANDERSON never paid the EMD, and the contract for the Walden Hall property was terminated.

28.    On or about December 3, 2020, ANDERSON, operating through The Roar Trust, made an offer to purchase a property in Madison, Virginia ("Lindsay Lane" property). The offer price of the Lindsay Lane property was approximately $4.2 million. Closing was scheduled for December 21, 2020, and an EMD in the amount of $42,000 from ANDERSON was due five days after the date of contract ratification. In connection with the transaction, ANDERSON caused to be sent a proof of funds purporting to confirm a private client banking account at Chase Bank with a balance in excess of $25 million. No such account with that amount of money has ever existed.

29.    On or about December 3, 2020, ANDERSON cancelled a showing of the Lindsay Lane property for a third time. ANDERSON's real estate agent sent an email to the sellers containing a purported statement from ANDERSON that ANDERSON's health was not well because of her "disease," which the agent clarified was cancer. On or about December 7, 2020, the sellers of the Lindsay Lane property learned of ANDERSON's criminal history background and raised the issue with ANDERSON's real estate agent. The transaction was thereafter terminated.

30.    In or about January 2021, ANDERSON, operating through The Roar Trust, made an offer to purchase a property in Carmine, Texas ("Koether Road" property). The offer price of the Koether Road property was approximately $6.7 million. Closing was scheduled for February 10, 2021. In connection with the transaction, on or about January 15, 2021, ANDERSON sent an

EMD check through the mail in the amount of $67,000 from her residence in Madison County, Virginia. No such account with that amount of money has ever existed. The transaction was thereafter terminated.

31. On or about March 19, 2021, ANDERSON changed or caused to be changed the registered name of The Roar Trust to The Anderson Revocable Living Trust ("The Anderson Trust").

32. In or about April 2021, ANDERSON, operating through The Anderson Trust, made an offer to purchase a property in Winchester, Virginia ("Wagon Wheel Ranch"). The offer price for the Wagon Wheel Ranch was approximately $4.2 million. Closing was scheduled for June 1, 2021. On or about April 21, 2021, ANDERSON sent, or caused to be sent through R.G., several emails regarding her inability to provide an EMD or pay for the property, including that she was a victim of identity theft. The transaction was never finalized.

E. **Bankruptcy Filing and Communication with the Financial Litigation Unit**

33. On or about July 1, 2020, amidst ANDERSON's real estate scheme, ANDERSON filed a Chapter 13 Voluntary Petition for Bankruptcy in the U.S. Bankruptcy Court for the Western District of Virginia. ANDERSON reported that she was the sole proprietor of the Roar Charitable Fund, LLC, DBA Sage Wisdom Publishing. In the petition, ANDERSON estimated her total assets to be worth $0 to $50,000. In a summary of assets filed in the bankruptcy on or about July 14, 2020, ANDERSON listed her total assets as $14,554.00, and her total liabilities as $234,735.48. ANDERSON also admitted that she has previously been identified as "Favara" and that she owed money to a variety of parties associated with the above schemes, including R.B. and the U.S. District Court clerk.

34. On or about July 24, 2020, ANDERSON responded to the Financial Litigation Unit (FLU) in the U.S. Attorney's Office for the Western District of Virginia, by sending a certified worksheet about her ability to pay the money owed from her previous criminal case. Among the things Anderson stated were that she does not have a will, she only has one bank account, and that she only filed for bankruptcy in 2006, all of which were not true.

35. On or about August 5, 2020, ANDERSON filed a motion to dismiss her bankruptcy case, which the bankruptcy court granted on or about August 14, 2020.

36. ANDERSON still owes the U.S. Government over $140,000 for her previous criminal judgment.

**F. Summary of Material Misrepresentations**

37. According to her health records, ANDERSON does not have cancer.

38. According to her bank account records, ANDERSON does not have wealth nor the ability to purchase the real estate mentioned above.

**G. FBI's Search Warrant**

39. On or about April 26, 2021, the FBI conducted a search warrant at ANDERSON's residence in Madison County. At her residence, ANDERSON was printing checks for new real estate she was attempting to purchase, which was worth over $1 million. While the FBI was searching the house, ANDERSON attempted to hide those checks from law enforcement, who later found them on or about ANDERSON's person.

## COUNTS ONE THROUGH THREE
### (Mail Fraud)

40.    Paragraphs 1 through 39 are incorporated as stated herein.

41.    From in or about May 2016, to in or about April 2021, in the Western District of Virginia, the defendant, CHRISTINE FAVARA ANDERSON, with the intent to defraud, devised the above-described schemes and artifices to defraud and obtain money and property by materially false and fraudulent pretenses, representations, and promises.

42.    From in or about May 2016, to in or about April 2021, in the Western District of Virginia, for the purpose of executing or attempting to execute the above-described schemes and artifices to defraud and deprive, the defendant, CHRISTINE FAVARA ANDERSON, knowingly caused to be delivered by mail or a private and commercial interstate carrier, according to the direction thereon, the following matters:

| Count | Date | Matter |
|---|---|---|
| 1 | 12/12/2017 | USPS mail, containing royalty check to S.W. for $3,631.39 |
| 2 | 3/16/2020 | USPS mail, containing loan repayment check to R.B. for $25,000 |
| 3 | 1/15/2021 | USPS mail, containing EMD check for $67,000 for Koether Road property |

43.    All in violation of Title 18, United States Code, Section 1341.

## COUNTS FOUR THROUGH ELEVEN
### (Wire Fraud)

44. Paragraphs 1 through 39 are incorporated as stated herein.

45. From in or about May 2016, to in or about April 2021, in the Western District of Virginia, the defendant, CHRISTINE FAVARA ANDERSON, devised and intended to devise a scheme to defraud the individuals mentioned above, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

46. From in or about May 2016, to in or about April 2021, in the Western District of Virginia, the defendant, CHRISTINE FAVARA ANDERSON, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described as follows:

| Count | Date | Matter |
|---|---|---|
| 4 | 12/12/2016 | Emails from ANDERSON to J.T. promising to provide audio books |
| 5 | 12/17/2019 | Email from ANDERSON to real estate agent in Aerie Farm transaction regarding false promise of wires |
| 6 | 3/15/2020-3/16/2020 | Text Messages from ANDERSON to R.B. regarding false reasons to need a loan from R.B. and false promises of repayment in checks |
| 7 | 4/18/2020 | Electronic signature and initials by ANDERSON for real estate contract for Crooked Run Farm, including initials on the false proof of funds |
| 8 | 7/17/2020 | Email from ANDERSON to real estate agent for Walden Hall transaction with false proof of funds |
| 9 | 12/3/2020 | Electronic signature and initials by ANDERSON for real estate contract for Lindsay Lane property |
| 10 | 1/9/2021 | Electronic signature and initials by ANDERSON for real estate contract for Koether Road property |
| 11 | 4/15/2021 | Emails between ANDERSON and parties to Wagon Wheel transaction regarding EMD check, lack of funds, and ANDERSON's health |

47. All in violation of Title 18, United States Code, Section 1343.

## COUNT TWELVE
### (False Statement)

48. Paragraphs 1 through 39 are incorporated as stated herein.

49. On or about July 24, 2020, in the Western District of Virginia, the defendant, CHRISTINE FAVARA ANDERSON, did willfully and knowingly make materially false, fictitious, and fraudulent statements in a matter within the jurisdiction of the executive branch of the government of the United States, by stating that she only had one bank account, that she did not have a Will, and that she had only filed for bankruptcy in 2006. The statements and representations were false because, as CHRISTINE FAVARA ANDERSON then and there knew, ANDERSON had multiple bank accounts, ANDERSON executed a Will in 2019, and ANDERSON filed for Chapter 13 Bankruptcy in the Western District of Virginia on or about July 1, 2020, the same month.

50. All in violation of Title 18, United States Code, Section 1001(a).

## COUNT THIRTEEN
### (Concealing Records in Federal Investigation)

51.　Paragraphs 1 through 39 are incorporated as stated herein.

52.　On or about April 26, 2021, in the Western District of Virginia, the defendant, CHRISTINE FAVARA ANDERSON, did knowingly conceal printed checks for real estate transactions, which are records or documents, with the intent to impede, obstruct, and influence the investigation and proper administration of a federal search warrant, a matter that the defendant knew was within the jurisdiction of the Federal Bureau of Investigation, a department and agency of the United States.

53.　All in violation of Title 18, United States Code, Section 1519.

## FORFEITURE NOTICE

54. Paragraphs 1 through 39 are incorporated as stated herein.

55. The allegations contained in Counts One through Eleven of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

56. Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1341 and 1343 set forth in Counts One through Eleven of this Indictment, the defendant, CHRISTINE FAVARA ANDERSON, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s). The property to be forfeited includes, but is not limited to, the following:

   a. Black Motorola smart phone IMEI: 355391190585482;
   b. Hewlett Packard Pavilion Model: 17-g125cy laptop S/N 5CD53620LJ;
   c. Yellow Amazon tablet Model L5S83A S/N unknown;
   d. UMX smart phone Model: U693CL S/N 693CL70121027847;
   e. Gigaset tablet Model: QV830 S/N U8A5064MOONT;
   f. Cricket Overture 3 ZTE Model: Z851M smart phone S/N 329F8605248F;
   g. Hewlett Packard Tango printer Model: SNPRC-1805-01 S/N TH94B542K5;
   h. UMX smart phone Model: U693CL S/N 693CL20121038445;
   i. Amazon Echo Show 8 S/N G000RA0885230GB2;
   j. Samsung Galaxy S10 IMEI 355409101212037;
   k. Dark Blue Motorola smart phone IMEI: 355539119386942; and
   l. Dark Blue Motorola smart phone Model: XT2043-85 S/N unknown.

57. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

    58. All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL, this 12th day of May 2021.

/s/ Foreperson
GRAND JURY FOREPERSON

DANIEL P. BUBAR
ACTING UNITED STATES ATTORNEY